## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **BRUCE M. SKOORKA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**KEAN UNIVERSITY, et al.,**<br><br>**Defendants.** | Civ. No. 09-3428 (KM)(MAH)<br><br>**OPINION** |

Dr. Bruce M. Skoorka is a tenured associate professor of Economics and Finance at Kean University. Over the course of his employment, he has frequently complained of discrimination and alleged other illegal or wrongful conduct by persons affiliated with Kean. He filed an action against Kean in New Jersey state court in 2001 (a suit he ultimately lost at trial). In the current action, he alleges that Kean has retaliated against him for bringing that state action and for blowing the whistle on discrimination and illegal conduct. He alleges in addition that Kean has discriminated against him on the basis of his religion. Skoorka also sues his union, alleging that it should have forced Kean to address his complaints.

The defendants have filed motions for summary judgment as to all counts. With respect to the Union defendants, I will grant the motion as to all counts. With respect to the Kean defendants, I will generally grant the summary judgment motion, but deny it in part as to a portion of Count One (Title VII). In short, what remains of the case is a portion of the Count One retaliation claim under Title VII, asserted against the institutional Kean defendants only.

Skoorka complains of workplace frustrations familiar to many: needs unmet, requests denied, merit unrewarded. Given the circumstances as he perceives them, resentment is only human. Skoorka's gripes, however, tend

1

toward the diffuse and unremarkable. Typically, he speaks in generalities, often omitting the who-when-and-where of any particular occurrence. In some cases he does not even connect his complaints to any act by the defendants, but simply posits that they are to blame. In others, he excoriates the defendants for withholding benefits he did not ask for. And finally, he has attempted to revive a litany of rejected claims, dating back to the late 1990s, by recasting them as the bases for a claim of retaliation. What is lacking for the most part is evidence sufficient to create a genuine issue of fact that is material to a federal or state cause of action.

## Background

### Early complaints

Skoorka began working for Kean in 1996. *Skoorka I,* *1.[1] He was awarded tenure effective as of the 2001–02 academic year. *Id.* at *3. Over the course of his employment, Skoorka has lodged a number of complaints.

---

[1] Citations to the record will be abbreviated as follows:

"Kean Mot." – Memorandum of Law In Support of Kean Defendants' Motion for Summary Judgment, Dkt. 117-2.

"Skoorka Dep. I" – Deposition of Bruce M. Skoorka, dated February 4, 2014, Dkt. No. 123-5, Exh. 3.

"Skoorka Dep. II" – Deposition of Bruce M. Skoorka, dated February 10, 2014, Dkt. No. 123-6, Exh. 4.

"*Skoorka I*" - *Skoorka v. Kean Univ.*, No. A-1654-05T5, 2007 WL 2460160, at *1 (N.J. Super. Ct. App. Div. Aug. 30, 2007).

"*Skoorka II*" - *Skoorka v. Kean Univ.*, No. A-5618-08T2, 2011 WL 3667664, at *10 (N.J. Super. Ct. App. Div. Aug. 23, 2011)

"Skoorka Opp. to Kean Mot." – Plaintiff's Memorandum of Law In Opposition to Kean Defendants' Motion for Summary Judgment, Dkt. No. 123-1.

"Skoorka Stmt." – Plaintiff's Statement of Disputed Facts Under Loal Rule 56.1 in Opposition to Kean Defendants' Motion for Summary Judgment, Dkt. No. Skoorka Stmt..

"Union Mot." – Brief in Support of Union Defendants' Motion for Summary Judgment, Dkt. 119-1.

For example, sometime before 1998, Skoorka complained internally that the Chairperson of his department, defendant William Kempey, had discriminated against an African American colleague because of his race. *Id.* at *1. Later, Skoorka complained that the University was discriminating against Skoorka himself because he is Jewish. *Id.* at *3. He alleged that the University had refused to promote him and that members of the University had harassed him because of his religion. *Id.* Skoorka also complained internally about what he regarded as illegal conduct by the University. He alleged that defendant Kempey was misappropriating funds from the Economics Department for his personal use. *Id.* at *2. He based that accusation of embezzlement solely on his observation that the department lacked office supplies, copiers, printers, or secretarial support. *Id.* at *2.

**The 2001 State court action**

In November of 2001, Skoorka brought a state court action against Kean University, his union, and several individual defendants. He alleged that the University and the union had discriminated against him on the basis of his religion, had retaliated against him for reporting discriminatory and other illegal conduct, and had violated his rights under the First Amendment and the Equal Protection Clause. He brought claims under the Conscientious Employee Protection Act, the New Jersey Law Against Discrimination, Title VII of the Civil Rights Act, and 42 U.S.C. § 1983. *Id.* at *5.

That suit took some ten years, two jury trials, and at least two written opinions from the Appellate Division to fully resolve itself (although the Appellate Division observed that Skoorka's case was "always weak." *Skoorka II*, *1). At trial, the parties agreed that they would not offer evidence of any events occurring after February of 2002. *Id.* at *5. Some issues were decided by the trial court on summary judgment; others Skoorka voluntarily dismissed; and the rest were resolved in favor of the defendants by a jury. Most pertinently, the jury in the second trial found that Kean had not discriminated against Skoorka

3

in the promotion process.[2] In the end, Skoorka was unsuccessful on all counts of his complaint. The Appellate Division affirmed the trial court's rulings, as well as the jury's verdict, in August of 2011. *See Skoorka II.*

### EEOC complaint and prior federal court actions

While his suit was proceeding in state court, Skoorka brought other claims against the defendants before the EEOC and in federal court.

On July 24, 2006, Skoorka filed a charge of discrimination with the EEOC. He alleged that the defendants were continuing to discriminate against him on the basis of his religion, and that they were retaliating against him for voicing grievances and filing his state court lawsuit. (123-5, Exh. 1)

On April 6, 2007, Skoorka brought an action in this federal court, raising similar claims. (*See* No. 07-cv-1629, Dkt. 1). That case was assigned to District Judge William J. Martini. Skoorka named as defendants Kean University, the Board of Trustees of Kean University, William Kempey, Dawood Farahi, Vinton Thompson, Alfred Ngome Ntoko, and the State of New Jersey (collectively, the "Kean defendants"). He also named as defendants the Kean Federation of Teachers, the Council of New Jersey State College Locals, the American Federation of Teachers, and Maria del C. Rodriguez (collectively, the "Union defendants"). In October of 2007, Judge Martini dismissed the American Federation of Teachers from the case. (*See* No. 07-cv-1629, Dkt. 23)

On March 20, 2009, the parties entered into a consent order wherein Judge Martini dismissed Skoorka's case, but granted him leave to refile his complaint within 120 days. The order stipulated that if Skoorka refiled his complaint, the date of filing would relate back to April 6, 2007, the date that he filed his federal lawsuit. (*See* No. 07-cv-1629, Dkt. 32 at 2.)

---

[2]     The verdict sheet asked the following question: "Do you find that the plaintiff Bruce Skoorka has proven that it is more likely than not that Kean University engaged in intentional discrimination by not promoting him because he is Jewish?" The jury answered "No." *Skoorka II*, *11.

**The complaint in this action**

Near the end of that 120 day period, on July 9, 2009, Skoorka refiled his complaint. That new complaint—the one now before this Court—was nearly identical to the 2007 complaint, but it did add a few incidents that had allegedly occurred in the interim. The new complaint was given a new case number, 09-cv-3428, and was assigned to Judge Hayden. In September of 2009 the case was reassigned to Judge Linares. (*See* Dkt. 4.) Finally, in August of 2012, the case was reassigned to me. (Dkt. 75)

This complaint contains four counts: Count I (discrimination and retaliation in violation of Title VII of the Civil Rights Act); Count Two (New Jersey Conscientious Employees' Protection Act ("CEPA")); Count Three (New Jersey Law Against Discrimination ("NJLAD") /discrimination); and Count Four (NJLAD/retaliation). Skoorka alleges that the Kean defendants discriminated against him based on his religion, in violation of Title VII of the Civil Rights Act (Count One) and NJLAD. He also alleges that Kean retaliated against him because he engaged in two categories of protected activity: First, he reported suspected illegal conduct by members of the University. With respect to these reports, Skoorka brought retaliation claims under NJLAD (Count Four) and CEPA (Count Two). Second, Skoorka says he complained about racial and religious discrimination within the University. With respect to these complaints of discrimination, Skoorka brought retaliation claims under Title VII (Count One), NJLAD (Count Four), and CEPA (Count Two).

The facts alleged in the Complaint, summarized briefly, are as follows. Skoorka alleges that he filed EEOC complaints, filed his 2001 lawsuit and subsequent appeals, reported alleged corruption within Kean University, and reported plagiarism by a member of the Kean faculty. In retaliation for these activities (or, alternatively, to discriminate against him because of his religion) the Kean defendants allegedly took numerous actions against Skoorka. (*See* discussion at Parts I and III.C, *infra*.) Briefly, Skoorka alleges that the defendants have caused him to be subjected to tax audits, have failed to deliver messages to him, have defamed him, have falsified student complaints against

5

him, have refused to post grades for his classes in a timely manner, have dealt unfairly with him in connection with office hours, have broken into his office and computer, have twice left a dead rodent near his home, have failed to promote him, have intentionally assigned him an undesirable schedule, have asked him to submit to a performance review, have refused to supply him with a secure parking space, have interfered with his teaching schedule at another university, have refused to provide him equipment and basic office supplies, and have interrupted his classes to verbally abuse him.

### The Southern District action, now transferred

On June 27, 2014, Skoorka filed yet another complaint, this time (for reasons that are not clear) in the Southern District of New York. (*See* No. 14-cv-4561) That complaint names as defendants Kean University, the Board of Trustees of Kean University, the State of New Jersey, William Kempey, and Dawood Farahi; it also names the Kean Federation of Teachers, the American Federation of Teachers, and the Council of New Jersey State Locals. That SDNY complaint simply incorporates by reference an EEOC complaint filed on January 30, 2014. The retaliatory actions alleged there seem to mirror allegations that Skoorka makes in this case: alterations to his course schedule (¶¶ 17-24); failure to promote (¶ 26); failure to provide a parking space (¶ 29); and the rodent incident (¶ 30). The SDNY complaint adds an allegation that Kean has paid him less than it paid his peers (¶ 28). That case was transferred from the Southern District of New York to this district on July 18, 2014, given docket no. 14-cv-4561, and assigned to me. (No. 14-cv-4561 Dkt. 5) It has not, however, been consolidated with this case.

### The motions now before this Court

Now before this Court are the motions of the Kean defendants and the Union defendants for summary judgment as to all counts. I summarize my holdings as follows.

In determining whether Skoorka has made out a prima facie case of discrimination or retaliation, I have been forced to conduct a preliminary screening of Skoorka's multifarious allegations. Most fail to meet the minimal threshold of possessing record support. By that I mean that there is not sufficient evidence to permit an inference that they occurred at all, that defendants had anything to do with them, or that they were retaliatory.

Next, I find that, as a matter of law, Skoorka's filing of a CEPA claim waives his NJLAD claim of retaliation, but does not waive any other claims. I then hold that, under CEPA, Skoorka has not made out a prima facie case of retaliation. Under the more forgiving standards of Title VII, however, he has made out a prima facie claim as to certain alleged acts of retaliation. He has not made out a prima facie case of religious discrimination.

Finally, I grant summary judgment as to all of the claims against the Union defendants. There is not sufficient evidence in the record that the Union deliberately chose not to press any grievance on Skoorka's behalf.

In short, the only claim to survive summary judgment, and that only in part, is Skoorka's Title VII claim of retaliation as asserted against Kean.

## **Discussion**

Claims of religious discrimination and retaliation under Title VII or NJLAD follow the burden-shifting regime of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Peper v. Princeton Univ. Bd. of Trustees*, 389 A.2d 465, 478 (1978); *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 281 (3d Cir. 2001). The plaintiff must make out a prima facie case of discrimination. The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason its action. The burden then shifts back to the plaintiff to show that the reason the defendant offered was pretextual or otherwise unworthy of belief. *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3d Cir. 2013).

Here, the defendants have not offered a second-step showing of a legitimate, non-discriminatory reason for the actions Skoorka alleges. Rather,

7

they argue that Skoorka's claims fail at the first step: he has not made out a prima facie case of discrimination. In determining whether Skoorka has made out a prima facie case, I first identify the factual allegations that have sufficient record support to be considered on summary judgment.

## I.    Allegations of Discrimination or Retaliation

Skoorka alleges that the Kean defendants retaliated against him for complaining of discrimination and other unlawful activities, and also that they discriminated against him on the basis of religion. Proving retaliation or discrimination requires a showing that the employer took some adverse action against the employee. For a Title VII discrimination claim, the definition of an adverse action is broader than it is for a retaliation claim. Each requires, however, that the plaintiff demonstrate some sort of negative action at his employer's hands.

Because the alleged adverse actions—some fifteen in number—relate to more than one count, I initially consider whether they possess enough record support to create a genuine material issue. Skoorka cannot, for example, use a particular event to make out a prima facie case of discrimination if there is not sufficient evidence in the record that the event actually happened. Nor can he use it to make out a case of retaliation if he cannot connect it to any of the defendants. I have considered these alleged incidents individually, and also in combination. Of the fifteen events that Skoorka alleges, twelve do not have enough support in the record, alone or in combination with the others, to warrant consideration. I discuss the evidence for each.

### A. Allegations lacking sufficient support in the record

#### 1) Tax audit

Skoorka alleges that the defendants "have caused him to be the subject of continuing tax audits." (Compl., ¶ 104; Skoorka Stmt., ¶ 269) Skoorka has not so much as specified the years that he was audited; he says only that the

8

audits occurred "early on."[3] (Skoorka Dep. I, 154) He has not explained how any of the defendants might have caused a public agency to initiate a tax audit against him. He has not even alleged with specificity that they did so; he simply attributes the audits to them.

This tax-related claim finds no support in the summary judgment record. I will not consider it in my analysis.

### 2) Interception of messages

Skoorka says that students would leave notes in his mailbox but that those notes would disappear before he could collect them. (Skoorka Dep. I, 117) Skoorka also says that students would leave messages with the department secretary, but that he did not receive them. *Id.* at 117; Skoorka Stmt., ¶ 270. He identifies no specific instances. He offers no affidavit or testimony from any student who claims to have left a message for him. I will not consider for its truth any unattributed hearsay testimony—for example, any statement that an unnamed person told Skoorka that there had been a message. *See generally* FED. R. CIV. P. 56(c)(2) (on summary judgment, court may consider admissibility of proffered evidence).

The allegation that Kean retaliated against Skoorka by intercepting his messages lacks any significant record support. I will not consider it.

### 3) Defamation

Skoorka alleges that the defendants have "public[ly] defamed and humiliated Dr. Skoorka based on false and fabricated accusations against him." (Skoorka Stmt., ¶ 281; Compl. ¶ 81) He does not identify any particular statement. He refers generally to "statements about Dr. Skoorka in opposition papers filed in connection with Dr. Skoorka's appeal in the 2001 lawsuit." These, he says, "implicitly and falsely accus[ed] him of academic dishonesty."

---

3    In his 2001 state court action, Skoorka likewise alleged that the defendants had caused him to be subject to a tax audit. *Skoorka I*, *5. His current tax-related allegations may therefore duplicate those in his earlier, unsuccessful state court action. It is impossible to tell.

(Skoorka Stmt., ¶ 282) Skoorka provides no evidence that the statements were untrue, or that the defendants knew the statements were untrue when they made them.[4] Presumably any factual statements in the University's papers in opposition to Skoorka's appeal were based on the record at the state court trial. Certainly I cannot assume, absent evidence, that they were not. The evidence of defamation is neither substantial nor specific, and I will not consider it.

### 4) Falsified student complaints

Skoorka alleges that the defendants have "falsified student complaints against Dr. Skoorka and/or instigated false student complaints against him." (Skoorka Stmt., ¶ 291). Skoorka testified in a deposition that "there was an attempt to get some students to make some other complaints about me." (Skoorka Dep. I, 136) He did not, however, identify any particular complaint, provide evidence that it occurred, or submit evidence that it was false.

Skoorka refers vaguely to an incident where a director of disability services at the University allegedly accused Skoorka of discriminating against students with disabilities. (Skoorka Dep. I, 136) He gives no names, dates, or other specifics. He does not factually connect the incident to any retaliatory motive. And according to Skoorka himself, "[t]he students themselves denied it. So, that went away." *Id.* at 136.

### 5) Posting of Grades

Skoorka's statement of facts alleges that the defendants "intentionally failed and refused to timely process and post grades for students in Dr. Skoorka's classes." (Skoorka Stmt., ¶ 273) He also alleges that the defendants "changed the grades of Dr. Skoorka's students, behind Dr. Skoorka's back and without his permission." (*Id.*)  Again, Skoorka identifies no specific examples,

---

[4]    I note in addition that these may be barred by *res judicata* and the entire controversy doctrine, although once again Skoorka's lack of specificity makes it impossible to say for certain. I observe in passing that such in-court statements would likely be privileged against a claim of defamation. *See Erickson v. March & McLennan Co.*, 569 A.2d 793, 805 (N.J. 1990).

gives no details such as names or dates, and provides no evidence. The only supporting citation is to his own deposition, which is no more specific. (Skoorka Dep. II, 158-159)

There is no specific evidence that any tampering with grades occurred, that it was impermissible, or that it was connected to discrimination or retaliation.

### 6) Office hours

Skoorka alleges that the Kean Defendants have taken inappropriate action against him with respect to office hours.

For example, he says that the University "falsely accused" him of violating the University's office hours policy. (Compl., ¶ 70) The documentary evidence that Skoorka cites contains nothing of the kind. It consists of routine logistical or scheduling communications. For example, Skoorka attaches a memo from defendant Kempey stating that Skoorka's office hours conflicted with his teaching schedule. (123-8, Exh. 21, 1949) Skoorka responds by email that they do not. *Id.* at 794. Nothing further on the subject appears in the record.

Skoorka produces an email from himself to a member of the university administration. In that email, Skoorka says that, although the University had notified him that he had not posted office hours, he had in fact done so. (123-8, Exh. 23, 21) In another email, apparently a follow-up, an administrator acknowledges that Skoorka has updated his office hours. *Id.* at 21. None of this amounts to any kind of inappropriate or adverse action.

Skoorka also alleges that the Kean defendants "required Plaintiff to maintain undesirable office hours." (Skoorka Stmt., ¶ 241) He explains no further. It stands to reason that a professor would be required to maintain office hours of some kind. Skoorka has not produced any evidence, however, that "undesirable" hours were forced upon him. There is no evidence that Skoorka's hours differed in any way from those of other faculty members.

Skoorka does say that other faculty maintained hours similar to his, and "were permitted to do so without any adverse action taken against them." (Skoorka Stmt., ¶ 246) But Skoorka provides no evidence that any office-hours-related "adverse action" was taken against him, either. *See supra.* Skoorka says that other faculty skipped their office hours, and that the University "condoned" this practice. *Id.* at ¶¶ 250-252. Skoorka does not identify any particular example of that. Nor does he establish that *he* was reprimanded for skipping office hours. From this record, I can draw no inference of disparate or adverse action.

There is simply no evidence to that Skoorka's dealings with the university regarding office hours were even mildly negative, let alone retaliatory or discriminatory.

### 7) Office and computer break-ins

Skoorka says the Kean defendants have repeatedly broken into his office and his computer. Skoorka testified in general that the break-ins have been occurring since 1999. (Skoorka Dep. I, 108-09)

One incident that Skoorka characterizes as a break-in occurred in April 2003. The record reflects, however, that the campus IT Department accessed Skoorka's computer to upgrade its software. (123-8, Exh. 24, 2585)

Skoorka alludes to another incident in 2009. In support, he provides an email from himself to Charles Anderson stating that his office had been broken into. Anderson responds, however, that two other offices had been broken into as well (and that computers had been stolen). (123-9, Exh. 38) And there is no evidence that defendants were involved in any such break-in.

Another incident, in 2011, consisted of the IT Department's removal of "a lot of spyware and a couple of viruses" so that Skoorka's office computer would "run faster." (123-8, Exh. 24, 296) Routine maintenance of an office computer is not a break-in, or an adverse employment action.

There is insufficient evidence of office or computer break-ins, retaliatory or otherwise. I will not consider them.

**8) Rodent incidents**

Skoorka alleges that the defendants made "death threats" by twice leaving a dead rodent in front of his home. There is nothing, however, to connect the defendants to the dead rodents.

Skoorka alleges that in July of 2007 he found a "large rodent-like animal, with a severed head" in front of his home. (Compl., ¶ 107; Skoorka Dep. I, 154) Skoorka filed a police report indicating that the animal had been on his sidewalk for two days, but that he did not see who had put it there. (123-9, Exh. 36, 2512) Skoorka had the carcass examined by a doctor of forensic pathology, who identified it as an opossum. This expert opined that the animal was "most probably a laboratory specimen that was killed and severed by a human being." *Id.* at 2515. The expert found the circumstances to be suspicious: "The finding of such an animal, severed into two parts, near the front door of an individual's home, is strongly indicative of its deliberate placement at that location." *Id.* at 2515. Skoorka alleges that he found a second dead rodent near his home in December of 2013. That second animal had not been decapitated. (Skoorka Dep. I, 155)

Skoorka alleges that in both cases, the rodent was planted deliberately by one of the defendants with the intent that it be understood as a death threat. It was, he says, "the old horse's head paradigm, except it was an opossum."[5] (Skoorka Dep. II, 165; *see also* Skoorka Dep. I, 155) Skoorka, though, provided no evidence—not even circumstantial evidence—that any defendant was involved in leaving the rodent carcasses near his home.

---

[5]    In Skoorka's telling, this was a bonsai version of an iconic scene from *The Godfather (I)* (Paramount Pictures, 1972). There, a fictional organized crime family terrorizes an uncooperative movie producer by slipping a severed horse's head into his bed. The notoriety of this, "one of the most famous scenes in film history" (http://en.wikipedia.org/wiki/Jack_Woltz), might lend some minimal plausibility to Skoorka's claim that the incident should be interpreted as a threat. But the rodent was not, like the race horse, the subject's prized possession; it was on the sidewalk, not in the subject's bed; its presence on the sidewalk is not otherwise inexplicable; and the incident did not allegedly occur in close temporal proximity to any alleged provocation by the subject.

(Skoorka Dep. I, 155-56, 159-60) There is no way to determine whether this was a coincidence, the act of a disgruntled neighbor, or something else. Without some minimal evidence connecting the defendants to this incident, it cannot serve as evidence of employment discrimination or retaliation.

### 9) Failure to promote

Skoorka, who has tenure, alleges that the Kean defendants have wrongfully failed to promote him from associate professor to full professor, and that the Union failed to support his promotion. (Compl., ¶ 54; Skoorka Stmt. ¶ 160; Skoorka Dep. II, 95-97, 99-100) Skoorka, though, has not made out a claim that the defendants' failure to promote him amounts to religious discrimination or a retaliatory adverse action.

First, Skoorka acknowledges that Kean has a process in place for promoting professors. A professor submits an application to a promotion committee within his own department; that committee recommends a disposition to a university committee; the university committee ranks all the applicants for promotion and submits a recommendation to the Board of Trustees and the President of the university; and the Board and the President ultimately approve or reject the proposed promotion. (Skoorka Dep. I, 34-35; *Skoorka I*, *2-3)

But Skoorka has not applied for promotion since 2002. That is the last actual denial of promotion. Since then, he has not initiated the University's promotion process. He considers himself to have a "standing application for promotion," because the University knows that he wishes to be promoted. He further suggests that an application for promotion would have been "futile." (Skoorka Dep. I, 34; Compl., ¶ 54). Nonetheless, he concedes that his last actual application for and denial of promotion occurred in 2002.

Under the University's established procedures, denial of promotion is a discrete and identifiable act. The University's later, ongoing failure to bestow a promotion *sua sponte* is simply too vague and diffuse to constitute an

14

identifiable adverse or retaliatory action.[6] *Cf. AMTRAK v. Morgan,* 536 U.S. 101, 115, 122 S.Ct. 2061 (2002) (For Title VII statute of limitations purposes, "[d]iscrete acts such as ... failure to promote ... are easy to identify. Each incident of discrimination and *each retaliatory adverse employment decision* constitutes a separate actionable 'unlawful employment practice.'") (emphasis added).

Second, to the extent that Skoorka is alleging that the University's failure to promote him in 2002 is actionable here, that claim would be barred by *res judicata* and the statute of limitations, for the reasons stated in Part V, *infra.*

Third, even setting aside timing issues, Skoorka concedes that he does not meet the criteria for promotion. He explained in deposition that there are several areas that the University considers in deciding whether to promote a professor: Teaching quality; academic service (like creating new courses and sitting on committees); research and publications; professional growth ("nobody even knows what that means," says Skoorka); and community service. (Skoorka Dep. I, 44). *See also Skoorka I,* 2007 WL 2460160, *3 ("The criteria for promotion to associate professor [in 2000] were mastery of the subject matter, continuing growth, effectiveness in teaching and community service, and scholarly ability.").

Skoorka acknowledges that he is ineligible for promotion, but blames the defendants. "There are various things that you need to do to get promoted, and none of those things I can show because of the situation I'm in." (Skoorka Dep. I, 38). For example, "in order to reapply, I need recommendations from faculty who are not going to give me any recommendations, because the word is out that, you know, to back off and not support Dr. Skoorka." (Skoorka Dep. I, 37)

---

[6]     Skoorka does name five professors who, he says, were promoted without actually applying for promotion. (123-5, ¶ 32) Whether faculty members went through the promotion process is an ascertainable administrative fact. The Magistrate Judge assigned to the case ordered the University to disclose in discovery whether named faculty members had gone through the promotion process. Skoorka's papers do not allude to any information turned over in discovery. Skoorka simply rests on his own say-so that certain individuals were promoted without having applied for promotion.

He says he has not sat on any committees because he has been "marginalized" and was "pulled off every single committee that I was serving on." He does not name any of these committees, or provide any further specifics. (Skoorka Dep. I, 38, 44)

Other major criteria would not seem to be subject to manipulation by the University. Skoorka concedes, for example, that he has not published anything since 2005, and the last publication referred to in the record occurred sometime before 2000. (*Skoorka* II, *2) He identifies no examples of community service.

Particularly in light of Skoorka's failure to apply for promotion since 2002, there is no denial of promotion, *simpliciter,* that can be identified as an adverse or discriminatory action. Out of caution, I consider the claim behind the claim: that the University is to blame for Skoorka's failure to meet the relevant criteria. As to that, Skoorka would have to point to specific evidence or identify specific events. He does not. Vague allegations that "the word is out" simply will not do; there is no specific evidence in the record that the University unfairly blocked him from applying for promotion or meeting the relevant criteria.

I therefore will not consider the failure to promote Skoorka as a retaliatory act. I also reject it as an independent claim of religious discrimination. (*See* further discussion at Part V, *infra.*)

### 10)      Course schedule

Skoorka alleges that the defendants manipulated his teaching schedule in unfavorable ways. First, Skoorka alleges that from the Spring 2006 semester through the Fall 2008 semester, he was required to teach more than two days per week, while several other faculty members were not. (Compl., ¶ 61) ("Subsequent to October 18, 2005 and through at least the Fall of 2008, Defendants allowed virtually all other members of the Department, who are non-Jewish, who have not engaged in Dr. Skoorka's protected activities, or who have an unlawful quid pro quo arrangement with Dr. Kempey, to maintain a

two-day teaching schedule and teach classes that they want to teach. Such faculty members included Dr. Kempey, Dr. Kim, Dr. Saffer, Dr. Condon, Jacqueline Jonnard Griffith (now a former faculty member), and CathyAnn Tully."). The evidence that Skoorka presents does not support his claim.

The records cited by Skoorka demonstrate that in the Spring 2006 semester, Skoorka himself taught only 2 days per week—as did Kempey, Kim, Saffer, and Condon. (123-6, Exh. 6, 2038) In the Fall of 2006, Skoorka taught only two days per week. (123-6, Exh. 7, 1926, 785) For the Spring 2007 and Fall 2007 semesters, Skoorka has provided emails in which he complains about his schedule. But he has provided no evidence as to how many days per week he actually taught, or how many days other professors taught. (*See* 123-6, Exhs. 8, 9) As to the Fall 2008 schedule, the proffered evidence is similarly inadequate. In the record is a tentative schedule as of February 2008 (123-6, Exh. 10, 389-97), but subsequent emails indicate that the faculty were later moved to a four-day-per-week schedule. *Id.* at 372. One email from Carol Condon, for example, states that she was switched to a four-day-per-week teaching schedule, and adds that *all* faculty will be keeping such a schedule. *Id.* at 372 In short, there is literally no record support for Skoorka's allegation that he was forced to teach more days per week than his colleagues were.

Second, Skoorka alleges that in numerous years, Kean "denied" him his "designated" course schedule. He means that Kean sometimes assigned him courses other than the ones he requested. (Skoorka Stmt., ¶¶ 188, 191, 196, 205, 206, 212) However, Skoorka does not provide any evidence 1) that he was entitled to his first choice; 2) that it was even possible for everyone to have his or her first choice; or 3) that, in cases of conflict, other professors' preferences were unfairly prioritized over his.

Third, Skoorka alleges that course assignments should have been, but were not, awarded on the basis of seniority. (Skoorka Dep. II, 106-07; Skoorka Stmt., ¶ 177). Skoorka has failed to establish that there was a seniority-based

17

policy.[7] There is an email from Charles Anderson stating that requests would be entertained. (123-7, Exh. 12) ("I prepare course listings early – you can always ask me where I am and place requests for course offering (as others often do).") But there is no indication that assignments were based on seniority. Indeed, there is evidence to the contrary: An email from Charles Anderson to Skoorka in August of 2011 says explicitly that "[s]eniority rules no longer hold – you may bump an adjunct, however." (123-8, Exh. 15, 91) At best, the phrase "no longer" implies that seniority had been considered at some unspecified earlier time.

In short, there is an evidentiary vacuum as to the allegedly discriminatory course assignments. Intuitively, one would assume that some combination of expertise, faculty availability, student demand, and general logistics might be involved in constructing a schedule. In one email, Skoorka himself quotes "Section 5.7.1 of the Handbook For Professional Development" (a document not in the summary judgment record) as saying: "The primary factors that should be considered in the construction of a schedule are listed below: needs of students, conflict prevention, spread across time slots and availability of rooms, availability of adjuncts, capacity to adjust, resident faculty needs." According to the policy as quoted by Skoorka, only after consideration of those many factors would the convenience of faculty be considered. (123-6, Exh. 6, 738) And seniority is not even listed as one of the many relevant factors.

At any rate, Skoorka's seniority-based protests refer to just two incidents: allegedly, Doug Mackenzie and Jerry Chandra, who are junior to Skoorka, were given priority at some point. (123-6, Exh. 6, 741) That adds up to two incidents over the course of 14 semesters (Spring 2006 through Fall 2013) in which seniority was outweighed by other factors. That does not suggest that Skoorka received disparate or unfair treatment. In addition, it

---

[7]    More commonly, a Title VII plaintiff will seek to set aside the application of an existing seniority system based on its allegedly discriminatory purpose. *See generally* 42 U.S.C. § 2000e–5(e)(2).

appears that in the Spring 2011 semester, the University "bumped" adjunct professors in order to accommodate Skoorka's course selections. (123-8, Exh. 14, 695-699) That happened again in Fall 2011. (123-8, Exh. 15, 91, 93) And in the Spring 2010 semester, Dr. Anderson stated that Dr. Skoorka's scheduling requests would be honored before those of a faculty member who had just joined the department. (123-7, Exh. 12, 502)

Skoorka, therefore, has not created a genuine issue of fact as to whether the defendants scheduled Dr. Skoorka's courses any differently than they did those of other faculty members.

## 11)    A-328 Evaluation

Tenured faculty at Kean are expected to undergo a review process, known as "A-328 review," every five years. (Skoorka Dep. I, 123-125; Compl., ¶ 76) Skoorka received tenure in December of 2000, effective as of the 2001-2002 academic year. *Skoorka I*, *3. He alleges that on three occasions since 2005, the defendants have asked him to undergo the A-328 review process. (Compl. ¶ 79; Skoorka Stmt., ¶¶ 296-97, 305) Skoorka says that such review would be inappropriate while he has litigation pending against Kean University—which has been the status quo for 13 years. (Compl., ¶ 77) He further alleges that Kean's attempts to make him undergo the review are discriminatory and retaliatory.

Skoorka acknowledges that he has not *actually* undergone an A-328 review in his time at Kean University, even though he has been tenured for at least 13 years. (Skoorka Stmt., ¶ 307) He knows of no other faculty member who had been tenured for as long as ten years and yet had not undergone an A-328 review process. (Skoorka Dep. I, 125) He admits that he has not been sanctioned for refusing to undergo an A-328 review. *Id.* at 129.

So Skoorka was asked, but not required, to undergo an A-328 review. He admits that all other faculty members have been required to undergo such a

review process, and he alone has not. I fail to see how excusing Skoorka from A-328 review—the very thing he requested—was adverse or discriminatory.

The real basis for Skoorka's complaint seems to be a contention that, were he to be reviewed, he would not fare well: "[I] wouldn't be able to get fair teaching evaluations, student evaluations and—there's—and my research has been hampered and so on. It'd be difficult to show—to demonstrate professional growth. And so, it's really just impossible to get—to provide the materials necessary for a fair A-328 review." (Skoorka Dep. II, 134) But he has not been reviewed—fairly, unfairly, or otherwise.

I cannot treat that hypothetical unfair A-238 review as an adverse action. It is not an action at all.

## 12)   Parking space

Professor Skoorka complains that the University has failed to provide him with an acceptable parking place.[8] As background, Skoorka reports that from 1998 to 2004, his car was "repeatedly vandalized, damaged and/or sabotaged at Kean. This included anti-Semitic graffiti on it, destruction and damage to his tires, and vandalism to his mirrors." (Compl., ¶ 98) In his 2001 state court action, he alleged that the defendants were responsible for the vandalism. *Skoorka I*, *13. Those claims did not succeed, and he has now recast them. In this action, rather than accusing the Kean defendants of vandalizing his car, Skoorka says that they failed to provide him with a "secure" parking space. (Skoorka Dep. I, 144)

But Skoorka didn't ask for one. He admits that after his car was originally vandalized (at some unspecified time prior to 2004) he did not renew his university "parking sticker." (Skoorka Dep. I, 145) He never spoke to anyone at Kean about finding a more secure parking space. *Id.* at 149. Skoorka

---

[8]      This will come as no surprise to anyone familiar with life in the academy. Clark Kerr, president of the University of California system in the 1960s, once described the university as "a series of individual faculty entrepreneurs held together by a common grievance over parking." www.nytimes.com/2003/12/02/national/02KERR.html.

explains that he "figured the issue was dead." *Id.* at 149. His claim, then, boils down to a complaint that the University did not *sua sponte* bestow upon him a more acceptable parking space.

More generally, Skoorka has made no showing that the University is responsible for safeguarding his car, or even that more secure facilities were available. Although he alleges discrimination, Skoorka has not identified any professor who possesses what he would regard as a "secure" parking space.

The parking allegations, then, cannot be considered examples of discrimination or adverse, retaliatory action.

I have considered these twelve issues alone and in context of all of the allegations. This is a case where twelve times zero is still zero. These allegations share a common infirmity: they lack the minimal record support that would permit a fact finder to conclude that they occurred, that they had any relation to the acts of the defendants, or that they could have constituted adverse, retaliatory, or discriminatory actions. In sum, I will not consider the twelve issues discussed above in deciding whether Skoorka has made out a prima facie case of discrimination or retaliation.

### B. Allegations With Record Support

Three other allegations, however, pass the summary judgment threshold in that they are supported by some evidence and are potentially material to one or more of Skoorka's causes of action. I enumerate them here, and discuss them in connection with the individual claims below. They are:

### 13)   Interference with NYU teaching schedule

In addition to his duties at Kean, Skoorka teaches one course per semester at New York University. (Skoorka Dep. I, 21) Skoorka alleges that the Kean defendants have interfered with his NYU teaching schedule. (Compl., ¶ 57; Skoorka Dep. I, 24; Skoorka Stmt., ¶ 191)

21

**14)   Deprivation of office equipment and supplies**

Skoorka says that the Kean defendants have refused to provide Skoorka with basic office supplies. For instance, he says that he no longer has a computer on campus, while other professors do. (Skoorka Dep. I, 107-108; Compl. ¶ 276)

**15)   Class visits**

Skoorka alleges that several other faculty members, including Bill Kempey, David Yamoah, Eufronio Carreno, and Bert Wailo, "stalked" him. (Skoorka Dep. I, 133; Compl., ¶ 81) By this, he means that they visited his class without warning. (Skoorka Dep. I, 133-35) As to Kempey alone, he has alleged that the visits were disruptive.

These three allegations possess enough specificity and record support that I may at least consider them. And I do consider them at greater length in connection with Skoorka's specific claims. *See infra.*

## II.   <u>Whether CEPA claim waives other retaliation claims</u>

Both sets of defendants argue that by filing a claim of retaliation under CEPA, Skoorka waived any claims of retaliation under NJLAD. (Kean Mot., 17-18). The Union defendants go one step further and argue that Skoorka has also waived any claim of retaliation under Title VII. (Union Mot., 7-10) I hold that Skoorka's CEPA filing waives any claim of retaliation under NJLAD, but does not waive any other claims.

### a. Waiver of NJLAD retaliation claim

CEPA explicitly provides that instituting a claim of retaliation under CEPA waives any claim of retaliation under another state law:

> Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract,

22

> collective bargaining agreement, State law, rule or regulation or
> under the common law.

N.J. STAT. ANN. § 34:19-8. New Jersey courts have interpreted this provision to mean that instituting a claim under CEPA will waive any state law claim that is "substantially related," in the sense of requiring the same proofs. *Young v. Schering Corp.*, 660 A.2d 1153, 1160 (N.J. 1995). Thus, for example, an NJLAD claim, like a CEPA claim, requires proof of retaliation; the filing of a CEPA claim therefore waives the corresponding NJLAD claim. *Id.* at 1153, 1155. *See also Bauer v. Galloway Twp.*, No. A-4669-06T1, 2009 WL 17923, at *9 (N.J. Super. Ct. App. Div. Jan. 5, 2009) (same); *Espinosa v. Cnty. of Union*, No. 01-CV-3655 (WJM), 2005 WL 2089916, at *11 (D.N.J. Aug. 30, 2005) *aff'd*, 212 F. App'x 146 (3d Cir. 2007) (drawing the same distinction). Conversely, claims that "require different proofs than those needed to substantiate the CEPA claim" are not waived. *Young*, 660 A.2d at 1160, 1161. Examples of claims that require different proofs include defamation, slander and malicious interference with prospective employment opportunities. Because those torts, unlike CEPA, do not require proof of retaliation, they are not waived by the filing of a CEPA claim. *Id.* at 1161.

Here, Skoorka has alleged claims of retaliation under both CEPA and NJLAD. Those claims are substantially related. Under CEPA, the plaintiff must show: (1) a reasonable belief that her employer's conduct violated a law, rule, or regulation; (2) a whistle-blowing activity; (3) an adverse employment action; and (4) a causal connection between her whistle-blowing activity and the adverse employment action. *See Caver v. The City of Trenton*, 420 F.3d 243, 254 (3d Cir.2005); *Dzwonar v. McDevitt*, 828 A.2d 893 (2003). Under NJLAD, a plaintiff must show three elements: (1) he or she engaged in a protected activity known to defendant; (2) he or she was subjected to an adverse employment decision; and (3) there was a causal connection between the two. *Bauer*, 2009 WL 17923 at *8. Both statutes essentially require a showing that the employer took an adverse employment action in retaliation for a protected activity. The

23

Appellate Division and this court have therefore held that a claim of retaliation under CEPA waives a related claim of retaliation under NJLAD. *Bauer*, 2009 WL 17923 at *9; *Ehling v. Monmouth-Ocean Hosp. Serv. Corp.*, 961 F. Supp. 2d 659, 672 (D.N.J. 2013); *Estate of Oliva v. New Jersey*, 579 F. Supp. 2d 643, 683 (D.N.J. 2008) *aff'd sub nom. Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788 (3d Cir. 2010).

Skoorka's CEPA and NJLAD claims are based on similar facts and proofs. They are related, not independent. The CEPA claim therefore waives the NJLAD retaliation claim, which must be dismissed.

That waiver is limited, however, to the NJLAD *retaliation* claim; it does not waive Skoorka's NJLAD claim that the defendants discriminated against him outright on the basis of his religion. Like the common law claims enumerated in *Young,* that discrimination claim does not require proof of retaliation. It is not substantially related to CEPA claim, and is not waived.

Judgment will therefore be entered on grounds of waiver in favor of defendants on Count Four (NJLAD/retaliation), but not on Count Three (NJLAD/discrimination).[9]

### b. Title VII claim of retaliation not waived by CEPA claim.

The Union Defendants next argue that Skoorka's CEPA claim waives his claim of retaliation under Title VII. (Union Mot., 7-10) I hold as a matter of law that it does not.

---

[9]     Looking ahead for a moment, I find below that Skorka's CEPA claim fails. *See* Part III, *infra.* The dismissal of a CEPA claim does not resurrect the waived claim of retaliation under NJLAD. *See Lynch v. New Deal Delivery Serv.*, 974 F. Supp. 441, 456 (D.N.J.1997) (citing *Flaherty v. Enclave*, 605 A.2d 301 (N.J. Ch. Div. 1992)). CEPA states that state law claims are waived by the "institution" of a claim under CEPA; the waiver is not contingent on the success of that claim. *See* N.J. Stat. Ann. § 34:19-8. A New Jersey court has interpreted that to mean that a plaintiff whose CEPA claim ultimately fails cannot then re-allege state law claims that had previously been waived. *Flaherty*, 605 A.2d at 305. Waiver aside, the failure of proof as to the CEPA claim would doom the related NJLAD retaliation claim in any event.

First and foremost is the plain wording of the waiver provision itself. CEPA provides that instituting a CEPA claim waives other claims under "State law." N.J. STAT. ANN. § 34:19-8 (quoted at pp. 23–24, *supra*). CEPA does not provide for waiver of claims under "any law" or under "federal law." That was likely a conscious omission, for in the immediately preceding sentence, the statute refers to "federal or State law." ("Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law...") The plain wording of the statute, then, effectuates a waiver of State claims, not federal claims.

Second, the nature and structure of CEPA imply that the waiver should be construed literally and narrowly. CEPA explicitly provides that it is not meant to alter other legal rights and privileges possessed by employees. N.J. STAT. ANN. § 34:19-8 ("Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law..."). The waiver provision (which does limit certain rights, privileges, and remedies) should therefore be applied strictly. More generally, the CEPA waiver provision operates in derogation of other remedial causes of action which are designed to combat discrimination. Courts generally construe exceptions to remedial statutes narrowly, and the Supreme Court of New Jersey has specifically done so with respect to CEPA. *See Young*, 660 A.2d 1160. That, too, argues against finding that institution of a CEPA claim waives a Title VII claim.

I therefore hold that Skoorka's claim of retaliation under Title VII is not waived by the filing of his CEPA claim.

That leaves Skoorka's claim of retaliation under CEPA (Count Two); his claim of retaliation under Title VII (Count One); and his claims of direct discrimination under Title VII and NJLAD (Counts One and Three). I consider them in that order.

25

### III.   <u>Retaliation under CEPA</u>

#### a. Prima facie case

To prove a cause of action for retaliation under CEPA, a plaintiff must establish four elements: 1) he had a reasonable belief that his employer's conduct violated a law, regulation, or clear mandate of public policy; 2) he performed a "whistle-blowing" activity described in N.J. STAT. ANN. § 34:19-3c; 3) the employer took and adverse employment action against the plaintiff; 4) a causal connection exists between the whistle-blowing activity and the adverse employment action. *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003); *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 404 (3d Cir. 2007).

#### b. First Prong – protected activity

With respect to the first prong, Skoorka has identified a handful of occasions on which he reported illegal or unethical conduct by employees of Kean University.

First, Skoorka points to his 2001 lawsuit, in which he accused many of the same defendants named here of racial and religious discrimination, retaliatory conduct, and creating a hostile work environment. See *Skoorka I,* *1. Skoorka now alleges that the Kean defendants have retaliated against him for bringing his prior lawsuit.

Second, Skoorka allegedly reported to the University that one of its professors had committed plagiarism. In 2006, Skoorka and one of his colleagues notified Kean University that a faculty member, Jacqueline Jonnard Griffith, had allegedly plagiarized a doctoral candidate's dissertation. (123-9, Exh. 28, 1187-88) Both dissertations were published, at least in part. *Id.* at 1188. Ms. Griffith eventually resigned from Kean in 2007. (123-9, Exh. 29, 1627). As to the legal sufficiency of this allegation, there is room for doubt; Skoorka seemingly reported misconduct by a fellow employee, not by his employer, and the employer apparently acted on Skoorka's complaint.

I will assume without deciding, however, that Skoorka's reports of wrongdoing constitute, or at least contain, some protected activities under CEPA.

### c. Second Prong - Adverse employment action

To make out a prima facie case of retaliation, Skoorka must show that his employer took retaliatory action against him. *Dzwonar*, 828 A.2d at 900; *Sarnowski*, 510 F.3d at 404. To constitute a retaliatory action under CEPA, the employer's conduct must attain a certain level of severity.

CEPA defines a "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J. Stat. Ann. § 34:19-2(e). Interpreting that language, courts have held that the employer's action must either affect the employee's compensation or rank, or "be virtually equivalent to discharge." *Klein v. Univ. of Med. & Dentistry of New Jersey*, 871 A.2d 681, 691 (App. Div. 2005). *See also Caver v. City of Trenton*, 420 F.3d 243, 249 (3d Cir. 2005) (quoting same language). Other courts, however, have taken a somewhat broader view. Examples of retaliatory conduct have included suspensions, demotions, changes to the length of the workday, changes in salary, hours, fringe benefits, or "physical arrangements and facilities," and altered "promotional procedures." *Beasley v. Passaic County*, 873 A.2d 673, 685-86 (App. Div. 2005). *See also Smith v. Twp. Of E. Greenwich*, 519 F. Supp. 2d 493, 511 (D.N.J. 2007) *aff'd*, 344 F. App'x 740 (3d Cir. 2009), as amended (Nov. 3, 2009) (quoting same language). A series of minor actions may, in the aggregate, amount to retaliatory conduct. *See Maimone v. City of Atl. City*, 903 A.2d 1055, 1063-64 ("[M]any separate but relatively minor instances of behavior directed against an employee may combine to make up a pattern of retaliatory behavior") (internal quotations omitted).

Skoorka has alleged fifteen incidents that he says constitute retaliatory conduct. Above, I held that twelve of those alleged incidents, whether considered separately or together, were not sufficiently supported by the record

27

to be counted towards a prima facie case of retaliation. (*See* Part I.A, *supra*). Here, I find that the remaining three incidents (*see* Part I.B, *supra*), do not rise to the level of an adverse employment action under CEPA.

   i.  *Interference with NYU teaching schedule*

In addition to his duties at Kean, Skoorka has taught one course per semester at New York University. (Skoorka Dep. I, 21) Skoorka alleges that the Kean defendants have interfered with his NYU teaching schedule. (Compl., ¶ 57) First, Skoorka argues that had his schedule at Kean been more accommodating, he would have taught more courses at NYU. (Skoorka Dep. I, 24). Second, he recounts a specific instance in which the University's alteration to his teaching schedule interfered with his teaching schedule at NYU. The first contention is wholly unsupported by the record. The second has some minimal record support, but does not rise to the level of an adverse employment action.

When Skoorka says he would have taught more than one NYU course, he is hypothesizing. There is no evidence, from Kean or from NYU, that Skoorka ever asked to teach an additional NYU course. And there is no evidence that his decision to teach only one NYU course was forced on him by some retaliatory change to his schedule. Skoorka says that NYU permits him to teach only at night, and that Kean schedules some (though not all) of his classes in the evening, creating potential conflicts. The record demonstrates, however, that for the entire period 1996-2005, Skoorka taught at Kean only two days per week. (123-6, Exh. 6, 2038; 123-6, Exh. 7, 1926, 785; Skoorka Dep. I, 67; Skoorka Stmt., ¶ 224) Presumably, he was free to teach elsewhere at least three weeknights (or perhaps two, based on his Sabbath observance, *see* Part V, *infra*). Yet he never at any time taught more than one course at NYU.

More generally, Kean was not required to be infinitely accommodating; it did not need to put NYU's interests ahead of its own. To make out a claim, Skoorka would have to demonstrate that Kean's scheduling practices were somehow vindictive, or were directed at him alone. Such proofs are lacking.

Skoorka compares his schedule to those of two other faculty members, Henry Saffer and Jacqueline Jonnard Griffith (Skoorka Stmt., ¶ 194) Dr. Saffer, Skoorka says, holds an outside position with the National Bureau of Economic Research. Kean, Skoorka says, allows Dr. Saffer to maintain "only one-half the regular course load." (Skoorka Stmt., ¶ 194) Skoorka provides no evidence of this. But even assuming it is true, it is not a suggestive comparison. A University might well accommodate a professor's wish to serve on a prestigious research body,[10] but not merely to supplement his income by moonlighting at another University. With respect to Griffith, Skoorka presents no relevant evidence at all. He offers nothing but his own general statement that she taught adjunct courses at Fairleigh Dickinson University "for years." *Id.* Skoorka, too, taught outside courses for years; he offers nothing about the specifics of scheduling that might give rise to an inference of inequitable or disparate treatment.

Skoorka does allege one specific and identifiable incident. (Skoorka Stmt., ¶ 191) On February 7, 2006, Kean scheduled Dr. Skoorka to teach a Tuesday evening course during the upcoming Fall 2006 semester. (123-6, Exh. 7, 1911) On February 11, 2006, Skoorka notified the University that a Tuesday class would interfere with a course he teaches at NYU. *Id.* The University responded in writing: "[I]n order to accommodate your desire not to teach on Tuesday nights, I write to ask if you would prefer to teach on Thursday night or a double period day time course on Friday. Either alternative will adhere to the three day teaching rule. Please advise me ASAP as to your decision. If I do not hear from you by Friday, March 10, 2006, your previously assigned schedule will stand." *Id.* at 1915. There is no evidence that Skoorka ever responded to this message.

On July 24, 2006, however, Skoorka notified the University that he had filed a charge of discrimination with the EEOC. (123-6, Exh. 7, 667) On July 25, 2006, the University notified Skoorka that it had cancelled his Tuesday

---

[10]   The curious reader may consult www.nber.org/info.html, but I do not rely on this extra-record material.

night course because of low enrollment. *Id.* at 1921. On July 25, 2006, Skoorka advised the University that he had moved his Tuesday night class at NYU to Thursday night in order to accommodate his teaching schedule at Kean. *Id.* at 660. On August 28, 2006, the University notified Skoorka that it was changing his schedule to assign him a course on Thursday evenings. *Id.* at 1925-26. That rescheduling by Kean would have created a conflict with the NYU course that Skoorka recently had moved to Thursday. On September 6, 2006, however, the University again rescheduled the Thursday night course, moving it to Wednesday night. *Id.* at 785.

From the temporal proximity, it is possible to infer that Kean was retaliating, or sending a message, when it rescheduled the Tuesday class to Thursday. But eight days later Kean relented and again rescheduled the Thursday class to Wednesday, resolving the conflict. There is an issue of fact as to whether this was intended as retaliation. But even assuming that it was, it is too minor to qualify as an adverse employment action under CEPA. After all, Kean quickly altered Skoorka's schedule to accommodate his NYU course; the scheduling conflict did not even exist except for a brief eight-day interregnum.

### ii. *Office equipment and supplies*

Skoorka says that the Kean defendants have refused to provide Skoorka with basic office supplies. For instance, he says that he, unlike other professors, does not have a computer on campus. (Skoorka Dep. I, 107-108; Compl. ¶ 276) He says he has given up complaining about the lack of a computer. (Skoorka Dep. I, 112)

The record is inconsistent as to whether Skoorka has the use of a Kean computer. Skoorka has provided a 2007 email from himself to Monica McKie (a member of the IT Department) in which he acknowledges that there is a computer in his office. (123-8, Exh. 24, 1952) There is also a 2011 note stating that a member of the IT Department has removed spyware and viruses from a computer used by Skoorka; indeed, Skoorka complains of this. (*See* Part I.A.7, *supra.*) Construing the record in the light most favorable to the non-moving

party, however, I will assume that, at least for some portion of the time covered by the complaint, Skoorka has not been provided with a computer.

Skoorka likewise says that he has no access to a printer or a photocopier, although other faculty members do. (Skoorka Stmt., ¶ 262, 276) Skoorka says his department has refused to provide him with basic office supplies like paper, pens, and chalk. (Skoorka Dep. I, 105-07) When he asks for supplies, the department secretary allegedly replies that they don't have any. Skoorka also says that his office is "on the other side of the building" from the offices of other members of his department. *Id.* at 38.

For sure, the shortages Skoorka describes may be annoying and inconvenient. Skoorka may have to rely on common computers in the library, or cadge office supplies. But such inconveniences do not materially alter the basic conditions of employment, and they are not "virtually equivalent to discharge." *Klein*, 871 A.2d at 691. They do not rise to the level of an adverse employment action for purposes of CEPA.

### iii.    Class visits/ "stalking"

Skoorka's complaint alleged that several other faculty members, including Bill Kempey, David Yamoah, Eufronio Carreno, and Bert Wailo "stalked" him. (Skoorka Dep. I, 133; Compl., ¶ 81) What Skoorka means, it turns out, is that certain persons visited his classroom without "announcing in advance" that they were coming. (Skoorka Dep. I, 133)

The "stalking" terminology aside, class visits could be disruptive or harassing. Skoorka alleges actual disruption, however, only as to Kempey. He says that Kempey visited his class "routinely" from 1999 through 2008. (Skoorka Dep. I, 133) "[S]everal times" during that period, Kempey allegedly "yelled and screamed" at Skoorka in front of the students. *Id.* at 134-35.

A similar allegation was also made in the 2001 litigation. Skoorka alleged that Kempey "ma[de] improper visits to his classes [and] abus[ed] him in the presence of students." *Skoorka I*, *5. Skoorka may be alleging that Kempey engaged in this "yelling and screaming" again after 2002, although this is

unclear. Nor do I consider merely raising one's voice, or losing one's temper, to constitute retaliation under the fairly demanding standards of CEPA. (Title VII is another matter. *See* Part IV, *infra*.) Skoorka never says anything about the content of this alleged shouting that would permit a fact finder to conclude that it materially altered the basic conditions of employment, or was "virtually equivalent to discharge." *Klein*, 871 A.2d at 691.

I therefore find that Skoorka has not made out a prima facie case of retaliation under CEPA. Accordingly, I will enter judgment for all defendants as to Count Two.


## IV.   Title VII Retaliation Claim Against Kean Defendants

Skoorka alleges a Title VII retaliation claim against the Kean defendants. It is unlawful for an employer to retaliate against employees who report violations of Title VII. *See* 42 U.S.C.A. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees…because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.").

### A.   Title VII Retaliation Contrasted With CEPA

Preliminarily, it is important to note three distinctions between retaliation claims under Title VII and those under CEPA, discussed above.

First, of the Kean defendants, Count One names only the University itself, its Trustees, and the State of New Jersey. The individual defendants are not named because they are not "employers" subject to liability under Title VII. *See Dici v. Com. of Pa.*, 91 F.3d 542, 552 (3d Cir. 1996); Skoorka Opp. to Kean Mot., 20 n.3; Compl. ¶ 133. The Trustees and the State have not separately moved for summary judgment. References to Kean in this section should therefore be read to include the University, the Trustees, and the State, but not the individuals.

32

Second, while a CEPA retaliation claim may be based on an employee's report of virtually any unlawful practice, a Title VII retaliation claim must be based on an employee's report of a violation of Title VII itself. 42 U.S.C. § 2000e-3(a). Skoorka's claim of retaliation under Title VII, then, may be based only on his complaints of racial and religious discrimination.

Third, Title VII's definition of retaliatory action is broader than that of CEPA. A particular act might be actionable under Title VII even if it is does not rise to the level of retaliation under CEPA. (*See* Part IV.B, *infra*.) That is a distinction with a difference in this case.

### B.   Prima Facie Case Under Title VII

To make out a prima facie case of retaliation under Title VII, Skoorka must establish that 1) he engaged in an activity protected by Title VII; 2) his employer took an adverse employment action against him; and 3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006), as amended (Sept. 13, 2006).

The first prong of the prima facie case can be satisfied, of course, by a plaintiff's filing of an EEOC complaint. But it can also be satisfied by a plaintiff's complaints to superiors about discriminatory treatment. *Moore*, 461 F.3d at 343. Here, Skoorka's 2001 lawsuit, his complaints to the EEOC, and his internal complaints of discrimination may all qualify as protected activities.

In the context of Title VII, courts have defined retaliatory action broadly. To qualify as retaliation, an action must merely be one that "a reasonable employee would have found" to be "materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted). *See also Moore*, 461 F.3d at 341 (acknowledging that *White*, superseding prior Third Circuit precedent, holds that an action is adverse if it might have dissuaded a reasonable worker from making or supporting a charge of discrimination). Not

every disagreeable act, however, qualifies as an adverse, retaliatory employment action. "[W]e believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth a general civility code for the American workplace." *White*, 548 U.S. at 68 (internal quotations omitted). "Personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers" are not actionable. *Id.* And, likewise, "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.* Nonetheless, the threshold for showing a retaliatory action is not high.

Here, Skoorka alleges that his employer took some fifteen adverse actions against him. I have already held that twelve of those did not have sufficient factual support to be considered as part of a prima facie case of retaliation or discrimination. *See* Part I.A, *supra.* For similar reasons, I will not consider those alleged incidents as part of Skoorka's prima facie case of retaliation under Title VII. I further held that the three remaining incidents did not rise to the level of adverse employment actions for purposes of CEPA. *See* Part III.c, *supra.* I must consider, though, whether those three incidents qualify as adverse employment actions under the lower Title VII standard: *i.e.,* whether they "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* I conclude that those three actions do qualify as adverse employment actions under Title VII.

As set forth above, Skoorka alleges that in 2006, Kean changed his schedule to create a conflict with his Thursday class at NYU. *See* Part III.C.i, *supra.* Kempey, the department chair, did so immediately after Skoorka notified Kean of his NYU schedule, and not long after Skoorka filed an EEOC complaint. That interference with outside employment, however fleeting, could have dissuaded a reasonable person from complaining of discrimination. That is enough to raise a triable issue as to retaliation. To be clear, only Skoorka's claim of retaliation with respect to this specific 2006 incident survives summary judgment. Skoorka's other claims of scheduling shenanigans do not.

34

Skoorka also alleges that his employer has deprived him of basic office equipment and supplies. *See* Part III.C.ii, *supra*. That, too, alone or in combination with the other acts, might warn off a reasonable employee who was considering filing a discrimination complaint. Because Skoorka has testified that he is the only professor who was denied these basic tools, and because the Kean defendants have not submitted contrary evidence, a fact finder could infer that this constituted retaliation.

Finally, Skoorka testified that defendant Kempey  has interrupted Skoorka's classes and yelled at him in front of students. *See* III.C.iii, *supra*. Skoorka has testified to the volume, but not the content, of Kempey's statements, leaving open the possibility that the parties were arguing about something wholly unrelated. But given the other acts, and the history of complaints and litigation, I find that a fact finder could connect the alleged tirades to retaliation. This conduct could be serious enough to dissuade a reasonable person from engaging in protected activity. Again, I clarify that only the Kempey allegations survive summary judgment; Skoorka's vague "stalking" allegations concerning other defendants do not.

One additional caveat. A claim of retaliation does not depend on the ultimate success of the plaintiff's underlying complaints of discrimination. All that is required is that a reasonable complainant in plaintiff's position could have believed that discrimination in violation of Title VII had taken place. *Moore v. City of Philadelphia,* 461 F.3d 331, 344 (3d Cir. 2006), as amended (Sept. 13, 2006). Thus, although I find below that Skoorka's claims of discrimination do not survive summary judgment, and although Skoorka's allegations of racial discrimination in his 2001 lawsuit were unsuccessful, Skoorka may still prove a claim of retaliation if he can demonstrate that he had a reasonable belief that the University had engaged in unlawful discrimination.

Summary judgment is granted to Kean as to the twelve alleged acts of retaliation enumerated in Part I.A, *supra,* which lack record support.  Thus Count One survives, but only as to Kean University, the Board of Trustees of

Kean University, and the State of New Jersey, and only with respect to the three specific allegations of retaliation enumerated in this Part: (a) the 2006 interference with Skoorka's NYU schedule; (b) the deprivation of office equipment and supplies; and (c) Kempey's disruptive visits to Skoorka's classroom. Further, all claims are barred to the extent they were disposed of by the earlier state action, which had a cutoff date of 2002.

## V.   Claim of religious discrimination

In addition to his retaliation claims, Skoorka claims that the University discriminated against him because of his Jewish religion or ethnic background. (Compl., Counts One and Three) Skoorka appears to be alleging that the University's conduct amounted to either disparate treatment or harassment.

A prima facie case of disparate treatment or hostile work environment, whether brought under NJLAD or Title VII, requires two essential showings. The plaintiff must show an adverse employment action, and must point to evidence that the action was taken for an unlawful, discriminatory reason.[11]

---

[11]    To make out a claim for hostile work environment or harassment under NJLAD, the plaintiff must show that the conduct complained of would not have occurred but for the employee's membership in a protected class, and that the conduct was severe or pervasive enough to make a reasonable person believe that the conditions of employment were altered and the working environment was hostile or abusive. *Maddox v. City of Newark*, 50 F. Supp. 3d 606, 627 (D.N.J. 2014) citing *Lehmann v. Toys 'R' Us, Inc.*, 626 A.2d 445, 453-54 (1993)

A claim of hostile work environment discrimination under Title VII requires a very similar showing. The plaintiff must show that 1) he suffered intentional discrimination; 2) the discrimination was pervasive and regular, 3) the discrimination detrimentally affected the plaintiff; 4) the discrimination would detrimentally affect a reasonable person of the same protected class in that position.

To establish a claim of disparate treatment under Title VII, a plaintiff must show that he 1) is a member of a protected class; (2) was qualified for the position he sought retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)

To establish a prima facie claim of disparate treatment under NJLAD, the requirements are substantially similar. *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 282 n. 13 (3d Cir. 2001). Like the analysis under Title VII, "the initial burden of showing a prima facie case is met when the plaintiff shows that 'it is

Skoorka's evidence establishes neither of these elements. He reports that he was once assigned a class that met from 4:30 pm to 7:15 pm on Fridays, potentially interfering with his observance of the Jewish Sabbath. However, when Skoorka pointed out that conflict, the University rescheduled the class so that it would end at 3:15 pm, well before sunset even in mid-winter. (123-8, Exh. 15, 99–100) The incident gives rise to no inference of religious discrimination.

Skoorka also reports that his department once scheduled a meeting on a Jewish holiday. (123-9, Exh. 41) Skoorka does not allege that he requested that the meeting be moved to another time. He does not state that he even inquired whether the Department had realized that the date of the meeting was a Jewish holiday. This stray incident, too, has no particular significance.

Skoorka says that on April 17, 2003, the first day of Passover, computer technicians upgraded the operating system of his computer to a newer version. (123-8, Exh. 24, 2585) Skoorka does not state that *he* was required to discharge any official responsibility on that holiday, or even that he was present. The relevance of this incident remains unexplained.

Skoorka complains about unfair class scheduling and the deprivation of office supplies, but provides no evidence that these were manifestations of religious bias. He can point to no inherent connection between these acts and his religion; this is not like, for example, citing an insulting epithet to demonstrate ethnic bias, or a lewd remark to show sexual harassment. In short, Skoorka presents nothing at all connecting these incidents to his religious faith or ethnic origin.

Skoorka claims that the University's ongoing failure to promote him to the rank of full professor is rooted in religious discrimination. He offers no evidence—not so much as a stray bigoted remark—in support of that claim. It also fails on multiple procedural grounds.

---

more likely than not' that the employer's actions were based on unlawful considerations." *Mandel v. UBS/PaineWebber, Inc.*, 860 A.2d 945, 956 (App. Div. 2004)

I have already discussed certain aspects of the allegedly discriminatory failure to promote Skoorka from associate professor to full professor. *See* Part I.A.9, *supra*. To the extent that Skoorka alleges that the University has denied him a promotion at any time after 2002, those claims are not supported by the record. *See id.* To review, Skoorka has not even applied for a promotion since it was denied him in 2002. To the extent that Skoorka is alleging that the University's failure to promote him in 2002 is somehow actionable in this suit, such a claim is barred by res judicata. A state court jury found that the University's denial of promotion at that time was not discriminatory. *See* p. 4 n.2, *supra*. Under *res judicata* principles, that claim cannot be relitigated.[12]

In addition, the 2002 denial of promotion, as well as any allegedly ongoing denial, would be barred by the statute of limitations. In theory, Skoorka could have brought a timely Title VII claim for a denial of promotion, if one had occurred in the (at most) 300 days preceding an EEOC complaint. *See*

---

[12]    A federal court must give a state court judgment the "same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 896 (1984); *See* 28 U.S.C. § 1738 (full faith and credit). Therefore, the New Jersey doctrine of collateral estoppel applies in this case.

New Jersey applies the familiar rule of collateral estoppel or issue preclusion, the " 'branch of the broader law of res judicata which bars relitigation of any issue which was actually determined in a prior action, generally between the same parties, involving a different claim or cause of action.'" *Tarus v. Borough of Pine Hill*, 916 A.2d 1036, 1050 (N.J. 2007) (quoting *Sacharow v. Sacharow*, 826 A.2d 710, 719 (N.J. 2003)). Also familiar is New Jersey's application of res judicata or claim preclusion, under which claims arising from the same transaction or occurrence will be barred in a later action. *Watkins v. Resorts Int'l Hotel and Casino, Inc.*, 591 A.2d 592, 599 (N.J. 1991).

Distinct and peculiar to New Jersey, however, is the "entire controversy" doctrine, which bars litigation of any claim that could have been joined with those brought in the earlier action. *Martgageling Corp. v. Commonwealth Land Title Ins. Co.*, 662 A.2d 536, 539-540 (N.J. 1995); *Estate of Gabrellian,* 372 N.J.Super. 432, 446 (App. Div. 2004); N.J. Ct. R. 4:30A.

42 U.S.C. § 2000e-5(e)(1).[13] But there has been no such application for promotion, or denial of promotion, since 2002.

Skoorka says that he has expressed a "standing" desire for promotion. He argues in effect that the University's failure to promote him every year since 2002 is a continuing violation, giving rise to a fresh and timely cause of action. The cases, however, reject any such "continuing violation" theory for purposes of Title VII failure-to-promote claims. *AMTRAK v. Morgan,* 536 U.S. 101, 115, 122 S.Ct. 2061 (2002) (For Title VII statute of limitations purposes, "[d]iscrete acts such as ... failure to promote ... are easy to identify. Each incident of discrimination and *each retaliatory adverse employment decision* constitutes a separate actionable 'unlawful employment practice.'"); *Rush v. Scott Specialty Gases,* 113 F.3d 476, 484 (3d Cir.1997) (reversing district court and holding that plaintiff's Title VII failure to promote claim and train claims are "discrete instances of alleged discrimination that are not susceptible to a continuing violation analysis.").

I will therefore enter judgment in favor of all defendants on Count Three. I will likewise enter judgment for all defendants on Count One insofar as that Count alleges direct religious discrimination in violation of Title VII.

## VI.   <u>Union defendants</u>

With respect to all claims, Skoorka alleges that the Union defendants should have, but did not, press Skoorka's grievances against Kean. I have previously stated in *dicta* that a union can be liable under Title VII if it makes a deliberate choice not to process an employee's grievance. *See Barrentine v. New Jersey Transit,* 44 F. Supp. 3d 530, 540 n.8 (D.N.J. 2014). Such a claim under Title VII would ultimately be rooted in the union's duty of fair representation.

---

[13]    The only EEOC complaint that appears on the face of this record was filed on July 24, 2006. Any Title VII claim would therefore have to be based on an adverse action that occurred on or after September 27, 2005.

*See, e.g., Vaca v. Sipes*, 386 U.S. 171 (1967). Assuming such a claim is legally viable, I nevertheless award summary judgment to the Union defendants.

All of the Union-related claims share a fundamental flaw: There is no evidence that the Union defendants deliberately chose not to pursue a grievance on Skoorka's behalf. In fact, all of the relevant evidence is to the contrary.

It is undisputed that Union representatives contacted Skoorka many times and encouraged him to meet with a grievance officer to discuss his allegations. For example, on January 14, 2006, Skoorka sent an email to defendant Maria del C. Rodriguez, the President of the Kean Federation of Teachers, complaining about his schedule and other matters. (119-5, Exh. D, 1) Rodriguez responded two days later, directing Skoorka to contact a grievance officer. *Id.* Rodriguez again contacted Skoorka and asked him to meet with a grievance officer on February 22, 2007; on July 10, 2007; on October 19, 2007; and on November 21, 2007 (119-5, Exhs. E, F, H, I). In March 2007, the grievance officer himself twice reached out to Skoorka and offered his assistance. (119-5, Exh. G; Skoorka Dep. II, 211-12)

Skoorka acknowledges that he did not speak with a grievance officer, but says that the Union was aware of his complaints. (Skoorka Dep. II, 213-16) That is not an adequate response. It is clear from this record that it was Skoorka himself, not the Union defendants, who failed to initiate the grievance process. Because the Union defendants did not make a deliberate choice not to process a grievance, they are not liable for any allegedly retaliatory actions that the Kean defendants took against Skoorka. I will therefore enter judgment in favor of the Union defendants as to all counts.[14]

---

[14]    I briefly note two alternative grounds for judgment in the union's favor.

First, to the extent I have already entered judgment in Kean's favor, I would also enter judgment for the Union defendants. The Union defendants should not be held liable for failing to press claims that have now been found to lack merit.

Second, Judge Martini previously dismissed the American Federation of Teachers from the predecessor action. (No. 07-cv-1629, Dkt. 23) Under the law of the case doctrine, that would constitute alternative grounds for dismissal of the AFT.

### **Conclusion**

Defendants' motions for summary judgment are granted as to all defendants and all claims, except as to a portion of Count One. Count One remains, but only as against defendant Kean, its Trustees, and the State of New Jersey, and only with respect to the three specific allegations of retaliation discussed in Part IV.B, *supra*.

Dated: June 2, 2015
Newark, New Jersey

KEVIN MCNULTY
United States District Judge