**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRUCE M. SKOORKA,<br>           Plaintiff,<br>v.<br>KEAN UNIVERSITY, et al.,<br>           Defendants. | No. 09 cv 3428<br>(consolidated with<br>14 cv 4561)<br><br>**MEMORANDUM OPINION** |

Before the Court are two motions (ECF nos. 148, 153) to dismiss the First Supplemental and Amended Complaint (ECF no. 143). For the reasons stated herein, those motions are largely granted. Because I write for the parties, I summarize the facts and procedural background only briefly. This Opinion must be read in the context of my prior Opinion, which for the most part granted defendants' motions for summary judgment. ("SJ Op.," ECF no. 130)

I. **Procedural Background**

The plaintiff, Dr. Bruce M. Skoorka, is a tenured associate professor of Economics and Finance at Kean University. Over the course of his employment, he has frequently complained of discrimination and alleged other illegal or wrongful conduct by Kean. Those complaints have given rise to a protracted course of administrative complaints and *pro se* litigation against his employer.

Skoorka filed an action against Kean in New Jersey state court in 2001. Summary judgment decisions in that action went up and down the appellate ladder. Eventually Skoorka lost at trial.

1

In 2007, Skoorka filed this action (the "First DNJ Action") in federal district court. (Civ. No. 07-1629, amended and refiled in 2009 as Civ. No. 09-3428). In the First DNJ Action, Skoorka sued Kean and the union representing its professors, as well as persons affiliated with those entities. To some degree, Skoorka's workplace grievances were now recast as retaliation for his assertion of his rights in the unsuccessful State action. I disposed of much, though not all, of that action on summary judgment. (*See* Opinion ("SJ Op."), ECF no. 130, and Order, ECF no. 131, dated June 2, 2015).[1]

The bulk of "Skoorka's multifarious allegations," I found, "fail[ed] to meet the minimal threshold of possessing record support. By that I mean[t] that there is not sufficient evidence to permit an inference that they occurred at all, that defendants had anything to do with them, or that they were retaliatory." (SJ Opinion at 7)[2] At the end of that analysis, just three of Skoorka's fifteen factual contentions remained.

I then analyzed Skoorka's legal claims in the context of the three factual contentions that possessed at least minimal record support. I held as follows:

- The NJLAD claim was waived as a matter of law by assertion of a NJCEPA claim. (SJ Op. 22–25)
- The NJCEPA claim failed for lack of any act that rose to the level of "retaliation" under that statute. (SJ Op. 26–32)

---

[1] ECF numbers, unless otherwise specified, refer to the docket in the First NJ Action, Civ. No. 09-3428.

[2] The twelve rejected factual allegations include Skoorka's blaming the defendants for the fact that his taxes were audited; his generalized, nonspecific accusation that defendants had intercepted messages from students; his accusation of "defamation," without specifying any particular statement, based on the University's surely privileged court filings in the State action; his accusation that the defendants "falsified student complaints," without identifying any such complaint; his characterization of the IT department's software upgrades as a "break-in" of his University computer; the unexplained presence of a dead rodent outside his house, which he construed as a death threat from defendants; and so on.

2

- The Title VII retaliation claim, by contrast, was sustained in part because three acts, if proven, could meet its comparatively lenient standard of retaliation. (SJ Op. 32–36)
- The claims of religious discrimination failed for lack of evidence. The few religiously tinged allegations bore no indicia of discrimination, and the rest had no connection to religion at all. (SJ Op. 36–39)
- The claims that the Union defendants failed in their duty of fair representation failed for lack of evidence that the Union, as opposed to Skoorka himself, failed to follow up on grievances. (SJ Op. 39–40)

What remained of the First DNJ Action after my summary judgment rulings was a Title VII retaliation claim against Kean, its Board of Trustees, and the State of New Jersey. That surviving Title VII retaliation claim is based on three essential allegations: (a) the 2006 interference with Skoorka's NYU schedule (but not other scheduling complaints); (b) the deprivation of office equipment and supplies; and (c) Kempey's disruptive visits to Skoorka's classroom.

Meanwhile, in June 2014, Skoorka filed a substantially similar action against the same defendants in the U.S. District Court for the Southern District of New York. Venue was immediately transferred back to this district, where the action was assigned Civ. No. 14-4561 (the "Second DNJ Action"). The motivation for this second action was explicit: Skoorka acknowledged that he filed in New York because "to date, it has not been possible for Plaintiff to obtain a fair hearing of his claims against Defendants in New Jersey." (Skoorka Brf., Civ. 14-4561 docket ECF no. 11 at 21). To all appearances, then, he simply refiled his New Jersey claims in what he considered a friendlier forum.[3]

Defendants, moving to dismiss the Second DNJ Action, characterized it as a "cut and paste" of the First. In response, however, Skoorka retrenched,

---

[3] The plaintiff filed yet another action in the Southern District of New York. This, too, was re-venued in New Jersey, where it was assigned docket no. 16 cv 3842. It will be referred to as the "Third DNJ Action." I do not discuss it separately in this Opinion, however.

3

stating that he meant the allegations of the Second NJ Action to be not a duplicate but an update of the First NJ Action. The Second DNJ Action claims, he said, were intended to cover a period stretching back no farther than June 2012, and hence did not duplicate those already disposed of on summary judgment. The Second NJ Action Complaint itself, however, did not make this at all clear; indeed, the claims appeared to substantially overlap those that Skoorka asserted in the First DNJ Action.

I nevertheless indulged this *pro se* plaintiff by consolidating the Second NJ Action with the First NJ Action, and permitting him to resubmit a version of his Second NJ Complaint as a Supplemental and Amended Complaint updating his earlier claims. Here are the instructions I gave in my Opinion:

> The problem remains that the complaint filed in this action, 14-4561, does not clearly state whether, let alone how, its claims are distinct from those already alleged in the First DNJ [Action] and discussed in my summary judgment opinion. Mr. Skoorka is therefore granted leave to file a proposed supplemental and amended complaint. That supplemental and amended complaint shall state clearly, with dates, places, and names of participants, the acts that he alleges post-date those encompassed by the First DNJ action thus far. It shall not rehash the history of events already the subject of the First DNJ action complaint and summary judgment motions. Particular facts must be alleged in support of the contention that the claims are new. That supplemental and amended complaint shall be filed within 30 days of this opinion and order. The defendants shall answer or otherwise respond to that supplemental and amended complaint within 30 days of filing.

(ECF no. 137, "Consolidation Opinion," dated 2/25/16)

The accompanying Consolidation Order stated the consequences of failure to abide by the Court's instructions:

> The plaintiff is granted leave to file under No. 09-3428 a supplemental and amended version of the complaint now filed in 14-4561, within 30 days. The subject matter of that complaint shall be strictly limited as described above. Any complaint not so limited will be stricken.

4

(ECF no. 138, "Consolidation Order" dated 2/25/16)

Skoorka did file a First Supplemental and Amended Complaint within 30 days, as permitted. ("1SAC", ECF no. 145) It asserts six counts:

*Count One*: Title VII Discrimination, Harassment and Retaliation, for the period of April 6, 2013 through June 27, 2014. (*See* 1SAC ¶ 17)

*Count Two*: New Jersey Conscientious Employee Protection Act ("NJCEPA"), for the period June 27, 2013 through June 27, 2014. (*See* 1SAC ¶ 18)

*Count Three*: New Jersey Law Against Discrimination ("NJLAD")- Discrimination and Harassment, for the period June 27, 2012 through June 27, 2014. (*See* 1SAC ¶ 19)

*Count Four*: New Jersey Law Against Discrimination – Retaliation, for the period June 27, 2012 through June 27, 2014. (*See* 1SAC ¶ 19)

*Count Five*: New York City Human Rights Law, N.Y.C. Admin. Code § 8:801.

*Count Six*: New York State Human Rights Law, N.Y. Exec. L. § 290.

Now before the Court are two motions to dismiss the 1SAC. One is brought on behalf of what are designated the "Kean defendants": The State of New Jersey, Kean University, Kean's Board of Trustees, former department chair William M. Kempey, and Kean president Dawood Farahi. (ECF No. 153) The second is brought on behalf of what are designated the "Union defendants": the Kean Federation of Teachers, the Council of New Jersey State College Locals, the American Federation of Teachers, and Maria Rodriguez. (ECF No. 148)  I decide the motions as follows.

## II. Governing Standards

### A. Conformity with Consolidation Order and Opinion

For the reasons expressed above, the slate of this case is very far from blank. Skoorka's claims have already been analyzed on summary judgment after the completion of discovery, and for the most part have been rejected on factual and legal grounds. As stated above, I will not permit a plaintiff in this

5

procedural posture to simply reboot the litigation by filing a new, duplicative complaint. Hence the restrictions imposed by my Consolidation Order and Opinion. I analyze the allegations of the 1SAC for conformity with that Order and Opinion.

### B. Summary Judgment Opinion and Law of the Case

Relatedly, I consider the 1SAC in the context of my prior summary judgment ruling. "Under the law-of-the-case doctrine, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *ACLU v. Mukasey*, 534 F.3d 181, 187 (3d Cir. 2008). It will be disregarded only if "extraordinary circumstances" warrant reconsideration of an issue decided earlier in the course of litigation. *Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116-17 (3d Cir. 1997). Such extraordinary circumstances include (1) the availability of new evidence; (2) a supervening change in the law; and (3) a clearly erroneous decision that would create manifest injustice. *Id.* at 117.

To the extent the "new" claims duplicate or are legally equivalent to the old ones, my earlier rulings will stand as the law of the case.

### C. Rule 12(b)(6)

I also consider in the alternative whether any new claims in the 1SAC are legally viable. Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Constr. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and

6

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also West Run Student Housing Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

Pleadings of *pro se* parties, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). Nevertheless, "*pro se* litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013). "While a litigant's pro se status requires a court to construe the allegations in the complaint liberally, a litigant is not absolved from complying with *Twombly* and the federal pleading requirements merely because s/he proceeds pro se." *Thakar v. Tan*, 372 F. App'x 325, 328 (3d Cir. 2010) (citation omitted).

### III. Analysis
#### A. Compliance with Consolidation Opinion and Order

My Consolidation Opinion and Order noted that the factual allegations of the Second DNJ Action Complaint, in its original form, were very closely parallel to those in the First DNJ Action. Dr. Skoorka asserted, however, that the Second DNJ Action was intended merely to update the First, with allegations dating from after the events covered by my summary judgment ruling. I granted permission to file a proposed 1SAC, requiring that it "shall state clearly, with dates, places, and names of participants, the acts that he

7

alleges post-date those encompassed by the First DNJ action thus far. It shall not rehash the history of events already the subject of the First DNJ action complaint and summary judgment motions." The accompanying Consolidation Order stated that "[a]ny complaint not so limited will be stricken."

The Court's caution in this regard should be understood in light of the history of this case. While the unsuccessful State action was pending, the plaintiff came to this Court to file the First DNJ Action, which purported to update the State allegations, but to some extent merely rehashed them. My summary judgment decision discusses the claims of the First DNJ Complaint. Despite development in discovery, for the most part they remained meandering, non-specific, and, as it turned out, completely unsupported by evidence. While my review of the summary judgment motions was pending, the plaintiff filed the Second DNJ Action in the Southern District of New York. That district court immediately transferred venue back to this Court. Thereafter, the plaintiff filed the Third DNJ Action in the Southern District of New York, again resulting in an immediate transfer of venue back to this Court.

In short, a picture emerges: Largely meritless claims, based on workplace grievances, are asserted; they are rejected as non-actionable or unsupported; the plaintiff files new (but also seemingly overlapping or repetitive) claims, asserting that nearly identical workplace grievances now constitute retaliation for assertion of the earlier, failed claims; and so on.

I will not, however, merely strike the 1SAC at the outset. True, on its face, the 1SAC does not completely address the concerns of the Consolidation Opinion and Order. It adds overall date limitations to the first four counts, stating that they are asserted for the periods beginning on June 27, 2012, April 6, 2013, or June 27, 2013, and ending on June 27, 2014. But it only sporadically complies with the Court's directive to "state clearly, with dates, places, and names of participants, the acts that he alleges post-date those

encompassed by the First DNJ action thus far," and it does not wholly refrain from rehashing the earlier events.[4]

I nevertheless consider the allegations of the 1SAC, to determine whether any require a departure from my earlier SJ Opinion or state an independent claim.

### B. Supplementation of the Title VII Retaliation Claims That Survived Summary Judgment

My SJ Opinion, after initial screening, found that there was at least a quantum of record support (primarily in Skoorka's deposition), for three factual claims:

(1) that the Kean defendants, by scheduling classes on Thursdays, interfered with Dr. Skoorka's NYU teaching schedule (SJ Op. 21);

(2) that the Kean defendants denied him basic office supplies, such as a computer (SJ Op. 22);

(3) that one Kean defendant, Bill Kempey, "stalked" him in his classroom and disrupted proceedings (SJ Op. 22).

Analyzing those facts in the context of Skoorka's various legal claims, I found a material issue as to whether those three acts constituted retaliation for his earlier (unsuccessful) assertion of claims under Title VII. (SJ Op. 34–35) The remaining legal claims were dismissed.

#### 1. "Denial of Designated Course Schedule, To Interfere With NYU Employment"[5]

In the SJ Opinion, the interference with Dr. Skoorka's teaching schedule is most thoroughly discussed in relation to the NJCEPA claim (SJ Op. 28–30); that factual discussion is incorporated and supplemented in relation to Title VII

---

[4] The University defendants have prepared a chart comparing the factual allegations of the 1SAC to those of the Complaint filed in 2009 in the First DNJ Action. It is fair to say that the allegations of the later Complaint closely track allegations of the earlier one. In many instances, the Court cannot tell whether it is the Complaint, or history, that is allegedly repeating itself. I consider the allegations, however, to the extent I can determine that they arise from later events.

[5] Point headings 1 and 2 are quoted from those in the 1SAC.

9

retaliation (SJ Op. 34). I found that, for the most part, Dr. Skoorka complained about the ordinary back-and-forth of scheduling, and hypothesized without facts that he might have taken on more teaching at NYU but for his obligations at Kean. In general, I found no evidence that Dr. Skoorka's two or three day per week schedule at Kean was unusual or atypical in a way that could give rise to an inference of discrimination or retaliation.

As to one incident in July 2006, however, I found a possible issue of fact. One day after Skoorka filed an EEOC complaint, the University cancelled a Tuesday night class for low enrollment; Skoorka then complained that he had already shifted his NYU schedule to Thursday in order to accommodate that now-canceled Tuesday Kean class; and a month later the University assigned him to a Thursday class. The claim is weakened by the fact that the University relented eight days later, moving the Thursday class to Wednesday. Nevertheless, given the temporal proximity and factual context, a fact finder could conclude that the University was retaliating or sending a message in response to the EEOC complaint. (SJ Op. 29–30, 34)

As to the NYU interference, the 1SAC adds allegations that in February 2012, defendants "sought" to schedule his Fall 2012 courses in a way that "would conflict with his NYU employment." (The NYU teaching apparently still involved Thursday evening classes.) (1SAC § 37) The 1SAC further alleges that for Fall 2013, Dr. Fulop "initially" gave Skoorka a note scheduling him for a Thursday night class, and "asked" him to do so. (1SAC ¶¶ 39, 41)[6]

---

[6] The 1SAC alleges generally that classes Dr. Skoorka wished to teach have been canceled and that he was "denied" his "designated teaching schedule" in the Fall of 2013 because one of his classes was cancelled. (This is depicted as part of an attempt to shift him to teaching another class, on a Thursday night schedule.) (1SAC ¶¶ 40, 41) As discussed in my SJ Opinion, nothing about ordinary scheduling of courses raises an inference of retaliation, absent evidence of some unusual departure from procedures, and no such evidence was produced. In particular, Dr. Skoorka failed to establish that, as claimed, his seniority gave him the right to priority in scheduling. (See SJ Op. 17–19.)

Intertwined with these allegations are Dr. Skoorka's allegations of religious discrimination based on his Jewish faith or ethnicity. My SJ Opinion rejected Title VII (or, in the alternative, NJLAD) claims of religious discrimination. (SJ Op. 36–39) The

10

As I pointed out in my earlier SJ Opinion, Kean is not obligated to defer to NYU's schedule (or, I assume, vice versa). There are no indications of surrounding circumstances that would give rise to an inference of retaliation. Indeed, the 1SAC does not even even forthrightly allege that Kean *actually* interfered with Dr. Skoorka's Thursday NYU teaching; it alleges only that Kean proposed a Thursday class in 2012, some six years after it had last been proposed. The motion to dismiss these supplemental allegations is granted.

### 2. "Denial of Equipment and Supplies and Disposing of Personal Property"

In the SJ Opinion, the denial of office supplies and equipment is most thoroughly discussed in relation to the NJCEPA claim (SJ Op. 30-31), and that discussion is incorporated and supplemented in relation to Title VII retaliation (SJ Op. 35). Because Skoorka testified that he is the only professor who was denied these basic tools, and because the Kean defendants submitted no contrary evidence, I found that a fact finder could infer a retaliatory motive, and permitted the Title VII retaliation claim to go forward on that basis.

As to office equipment and supplies, the 1SAC adds the following.[7] In March 2013, Dr. Skoorka complained of lack of a computer; in July 2014 a

---

incidents complained of were simply too insubstantial to give rise to an inference of discrimination. The 1SAC does not add anything significant. It alleges generally, but not factually, that the actions of which he complains were not suffered by non-Jewish faculty members. As to specifics, however, there is very little. The 1SAC alleges that the course cancellation emails were sent to Dr. Skoorka's account on the eve of or during the religious holiday of Rosh Hashanah, so he did not see them until the following Monday. (1SAC ¶ 41, 43, 44, 46) Like the previously alleged incidents, the sending of an email to the plaintiff's account in or around the date of a religious holiday comes nowhere close to a factual allegation of religious discrimination.

[7] Dr. Skoorka also alleges that during a period of medical leave (he returned in the spring of 2012), the Department relocated to another building. Skoorka came in and packed up his belongings, but the Department left them in an "un-secure area" where they were "subject to theft." (1SAC ¶ 56) This allegation at most establishes some sort of negligence by persons unknown, and perhaps third-party theft. (It is not clear, by the way, whether this was University property or Skoorka's own.) It does not set forth a claim of, *e.g.*, Title VII retaliation.

monitor, but not a "functional" desktop computer, were made available. (1SAC ¶¶ 54, 55) Dr. Skoorka's peers were provided such items. (1SAC ¶ 53)

Of course, scarce or inadequate equipment may signify just that and no more. But unlike, say, course scheduling, the provision of equipment and supplies is not inherently an administrative process that, even when properly performed, inevitably produces winners and losers. Given the context of the earlier allegations, I will permit supplementation to include the allegations of ¶¶ 54 and 55. Should any party wish it, I will also permit limited, targeted discovery on that subject.

### 3. Classroom Disruption

The 1SAC contains no further "stalking" allegations against Kempey or others, to the effect that they disrupted Dr. Skoorka's classroom.

## C. Other Supplemental Factual Allegations in the 1SAC

I next consider the viability of allegations in the 1SAC that relate directly to those claims that did *not* survive summary judgment. I reapply my legal analysis as law-of-the-case, but consider whether newly alleged facts require revival of any of the dismissed claims.

### 1. "False Accusation of Policy Violations-Office Hours"[8]

My earlier SJ Opinion rejected claims that the Kean defendants falsely accused Skoorka of failing to post his office hours, when he had actually done so. (SJ Op. 11) The evidence demonstrated nothing of the kind; what Dr. Skoorka characterized as "accusations" consisted of routine logistical or scheduling communications.

The 1SAC repeats the same claim, but sets it later in time, and adds a claim of "defamatory material." (1SAC ¶¶ 50–52) Only one specific date is provided (October 10, 2013), and no particulars—such as the speaker, the content of the communication, and so on—are provided. These allegations do

---

8   Again, the topic headings of this section are quoted from the 1SAC itself.

12

not support any of the claims alleged in the Complaint. Nor would they support an independent claim of defamation, to the extent it may have been intended.[9]

The motion to dismiss this portion of the 1SAC, based on accusations of violation of office hours policies, is granted.

### 2. "Denial of Promotion"

My SJ Opinion rejected Skoorka's claim that the University wrongfully failed to promote him from associate professor to full professor. (SJ Op. 14–16) It pointed out that he had not sought promotion since 2002, when his application was last denied. Skoorka insisted that, since that date, he has regarded himself as maintaining a "standing" request for promotion. He acknowledged, however, that he had not actually applied. The University's procedure, as is usual, is more formal; it has no provision for such a "standing" application. I also cited Title VII case law providing that an adverse employment action, such as a denial of promotion, is a discrete event, not a continuing status. Finally, Skoorka conceded that he does not meet the criteria for promotion, although he blamed the University for that.

The 1SAC simply realleges that in 2012–14, Skoorka had a "standing" application, but was not promoted. (1SAC ¶ 57) It adds nothing to the prior allegations. Claims in the 1SAC, to the extent they are based on failure to promote, are dismissed.

### 3. "Denial of Safe Parking Space"

In his State court action, Skoorka accused the Kean defendants of vandalizing his car. In the First DNJ Action Complaint, he merely accused them of failing to provide him with a parking space that sufficiently safeguarded his car from vandalism from 1998–2004. My summary judgment opinion found that this contention raised no material issue of fact, for a

---

9   Under New Jersey law, the elements of defamation, aside from damages, are as follows: (1) a false and defamatory statement; (2) communication to a third party, and (3) a sufficient degree of fault." *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 204 (D.N.J.). Failure to post or belated posting of office hours simply does not rise to the level of a defamatory falsehood. And in any event the factual allegations are insufficiently specific.

13

number of reasons. (SJ Op. 20–21) Among them were the fact that Skoorka has not sought a parking sticker since 2004, or requested a safer parking spot, because he "figured the issue was dead." (*Id.*) He simply faults the University for not taking it upon itself to bestow such a space on him.

In the 1SAC, no additional act by the University in the 2012–14 time frame is alleged. Skoorka simply repeats that he has been "denied" a safe parking spot, and alleges that his peers have such spaces. (1SAC ¶ 58) That virtually fact-free allegation is not enough to overcome my summary judgment ruling or reinject this issue into the case.

The motion to dismiss the 1SAC's allegations of denial of a safe parking space is granted.

### 6. "Death Threats"

My SJ Opinion rejected Skoorka's claim that the defendants twice communicated a threat of death, in the form of two dead rodents left near his home. (SJ Op. 13–14) One, discovered in July 2007, was decapitated; the other, discovered in October 2013, was not. As Dr. Skoorka put it, this was "the old horse's head paradigm, except it was an opossum." Even granting *arguendo* the semiotic significance of the dead rodents, understood in the context of 1970s American cinema, I was forced to conclude that there is "no evidence—not even circumstantial evidence—that any defendant was involved in leaving the rodent carcasses near [Skoorka's] home." (SJ Op. 13)

As to "death threats," the 1SAC contains nothing new. It alleges that "Defendants (or their agents) made death threats to Plaintiff, specifically in October 2013, and a police report was dated October 16, 2013. A prior death threat had been made against Plaintiff in 2007." (1SAC ¶ 59)

The "prior death threat" can only be a reference to the 2007 rodent incident. That was disposed of on summary judgment. The death threat in "October 2013" is surely a reference to the second rodent incident. That, too, was disposed of on summary judgment.

Claims in the 1SAC, to the extent they are based on death threats, are therefore dismissed.

### D. Claims Under New York Law

Counts 5 and 6 assert claims under the New York (State) Human Rights Law ("NYHRL"), N.Y. Exec. Law §§ 290 to 297, and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code §§ 8-101 to 131. These legal theories are newly asserted; previously, Dr. Skoorka's state law claims were asserted only under New Jersey law. Under established choice of law principles, however, New York law does not apply to this employment relationship, which took place solely in New Jersey.

Dr. Skoorka states that these claims arise out of Kean's scheduling of classes, which he says interfered with his part-time teaching at New York University. Because NYU is in New York, he argues, the "impact" of Kean's conduct occurred there, and New York law therefore applies. I disagree. Under either New York or New Jersey choice-of-law principles, New Jersey law applies.[10]

---

[10] See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 1021 (1941) (in diversity case, choice of law principles of forum state apply). Where venue has been transferred, the choice of law principles of the transferor court apply. See Van Dusen v. Barrack, 376 U.S. 612, 637-39 (1964). I do not tarry to consider the application of Van Dusen to a case, like the present one, where the case was venued improperly and immediately transferred. It makes no difference to the result. Whether under a "governmental interests" or a "most significant contacts" approach, the issue is not a close one.

> In tort cases, New York follows an "interest analysis" approach.
>
> "Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort" . . . . Where "conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders"

Dorsey v. Yantambwe, 276 A.D.2d 108, 110, 715 N.Y.S.2d 566, 569 (2000) (citations omitted). The same analysis applies to employment discrimination, which is not strictly speaking a tort, but merits the same approach, as it is a "case of conduct regulation." See Robins v. Max Mara, U.S.A., Inc., 923 F. Supp. 460, 465 (S.D.N.Y. 1996); Beebe v. N.Y. Times Co., 666 F. Supp. 2d 321, 331 (E.D.N.Y. 2009). The parties' domiciles, the locus of all the allegedly wrongful conduct, and the employer-employee

15

The 1SAC is not very specific about the manner in which Kean's scheduling of classes violated the NYHRL or NYCHRL. So far as I am aware, there is no substantive legal entitlement to the teaching schedule of one's choice. And if a retaliation claim is intended, surely it must involve retaliation for some prior assertion of rights under these New York statutes, which has never occurred.

At any rate, Dr. Skoorka's scheduling difficulties give rise to a claim only insofar as they may have constituted retaliation for Skoorka's assertion of his rights against Kean, which occurred in New Jersey. (*See* SJ Op. 21.) The employment relationship giving rise to any claim is between Dr. Skoorka and Kean in New Jersey. All of the allegedly wrongful acts of Kean took place in New Jersey. All of the acts of Dr. Skoorka in relation to Kean took place in New Jersey.

---

relationship giving rise to the claim are all here in New Jersey, pointing unambiguously to the application of New Jersey law.

In general, New Jersey follows the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws in tort cases:

> The contacts that are weighed in making that assessment include:
>
> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.
>
> [*Restatement, supra,* § 145(2)(a)-(d).][3]

*P.V. ex rel. T.V. v. Camp Jaycee,* 197 N.J. 132, 141, 962 A.2d 453, 458–59 (2008). These factors, too, point unambiguously to New Jersey.

Still, New Jersey's older "government interest analysis" approach appears to linger on in the specific context of employment. *Seibert v. Quest Diagnostics Inc.,* No. CIV. 11-304 KSH, 2012 WL 1044308, at *4 (D.N.J. Mar. 28, 2012) (Hayden, J.); *see also McGovern v. Southwest Airlines,* No. CIV.A. 12-3579 JBS, 2013 WL 135128, at *1–2 (D.N.J. Jan. 8, 2013) (Simandle, C.J.). Under that approach, the result is clearer still: "Using the governmental interest analysis, "New Jersey courts have consistently applied the law of the state of employment to workplace claims ...." *Seibert,* 2012 WL 1044308, at *4 (quoting *Satz v. Taipina,* No. 01–cv–5921, 2003 U.S. Dist. LEXIS 27237, at *45–46 (D.N.J. Apr. 15, 2003) (Simandle, J.), *aff'd,* 122 F. App'x 598 (3d Cir.2005)). The "workplace" from which the claims arise is a New Jersey one.

NYU is not alleged to have engaged in any wrongful conduct. The sole contact with New York is that Dr. Skoorka sought to, or did, teach at NYU on a particular night of the week when he was not teaching at Kean. The fact that inconvenient scheduling in New Jersey allegedly made it more difficult to take on a secondary teaching position in New York does not render New York law applicable. If that were so, an employee forced by his boss to cancel a Hawaiian vacation could presumably sue his New Jersey employer under Hawaiian law in Hawaii. I do not think even the most flexible conflict of laws approach would stretch that far.

Counts 5 and 6 are therefore dismissed.

## CONCLUSION

The motions (ECF nos. 148, 153) to dismiss the First Supplemental and Amended Complaint (ECF no. 143) are granted, except that the supplemental allegations of deprivation of office equipment and supplies (1SAC ¶¶ 54 and 55) will be permitted to go forward in the context of the Title VII retaliation claim. Because this is an amended pleading, preceded by ample proceedings in the consolidated cases, this dismissal is with prejudice.

An appropriate order follows.

Dated: Newark, New Jersey
June 30, 2017

KEVIN MCNULTY
United States District Judge